995 F.2d 1067
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ST. LUKE'S HOSPITAL, Plaintiff-Appellee/Cross-Appellant,
v.
SMS COMPUTER SYSTEMS, INC., Defendant-Appellant/Cross-Appellee.
 Nos. 92-1205, 92-1206.
 United States Court of Appeals, Sixth Circuit.
 June 1, 1993.
 
 Before: JONES and GUY, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant appeals the confirmation of an arbitration award granting the plaintiff $850,000 in damages. On appeal, the defendant argues the arbitrator exceeded the scope of his authority by refusing to enforce damage limitation clauses without indicating that he was, in fact, deliberately and intentionally voiding the clauses. The arbitrator offered no explanation of his award nor did he acknowledge in the "Notice of Award" that damage limitation provisions even existed. While we are mindful that under the current law, in general, an arbitrator is under no obligation to explain the reasons for his award, we find that this case requires a remand to the arbitrator for clarification of the award.
 
 I.
 The Agreement
 
 2
 In 1984, St. Luke's Hospital and Computer Synergy, Inc., later acquired by SMS Computer Systems, Inc., entered into an agreement for various computer hardware and software, and for services to install the system and train St. Luke's employees. Under the terms of the agreement, St. Luke's was to pay a total purchase price of $1.75 million, including $407,000 for software license fees and $840,289 for the hardware. The agreement, comprised of a master agreement with Exhibits A and B attached, and an addendum, contains two critical provisions relevant to the dispute that subsequently arose.
 
 
 3
 First, paragraph 11 of the master agreement is a limitation on liability clause which states:
 
 
 4
 11. Limitation of Liability. Synergy's entire liability and Client's exclusive remedy shall be as follows:
 
 
 5
 (a) Licensed System. If the licensed system warranted hereunder fails to materially conform to the applicable specifications, and Client has promptly advised Synergy in writing within the term of the warranty period, then Client's remedy shall be (1) for Synergy to provide services to attempt to correct such defects or (2) if Synergy is unable to correct such defects, then Client shall be entitled to recover its actual damages to the limits set forth in subsection (c) below.
 
 
 6
 (b) All Other Matters. For any other claim concerning the performance by Synergy under the terms of this Agreement, Client shall be entitled to its actual damages to the limits set forth in subsection (c) below.
 
 
 7
 (c) Maximum liability. See Paragraph 35 in Exhibit A of Software Agreement # 84-252.... In no event shall Synergy be liable to Client with respect to consequential damages.
 
 
 8
 (App. 36). The reference in paragraph 11(c) to "Paragraph 35 in Exhibit A" is specifically typed in a blank space provided a form contract. Paragraph 35 of Exhibit A provides:
 
 
 9
 Limitation of Liability (See Paragraph 11(c) of Standard Contract)
 
 
 10
 Synergy's total liability for damages incurred by (SLH) for any cause in contract or in tort, shall be limited to the amount of license fees paid out by (SLH) as of that time.
 
 
 11
 (App. 48).
 
 
 12
 Paragraph 16 of Exhibit A is an arbitration clause which states:[1]
 
 Arbitration
 
 13
 Arbitration shall apply to amounts in controversy in excess of $10,000 and up to the amount of license fees paid out by (SLH) as of that time; and as to those disagreements covered by Paragraph 15, the steps therein set forth shall be exhausted by the parties before the particular disagreement may be carried to arbitration.
 
 
 14
 Any dispute or controversy with respect to this Purchase Agreement and all Exhibits attached hereto or any other aspect thereof shall be determined in accordance with the provisions of Chapter 50 of the Michigan Revised Judicature Act. Any determination of award rendered shall be final and binding on the parties and judgment may be entered there on [sic] in the Saginaw County Circuit Court. If the parties cannot agree on a single arbitrator whose decision shall be final, then each party shall select an arbitrator, and the two arbitrators shall select a third arbitrator, in which event the decision of two of the three arbitrators shall be final. Arbitration shall be pursuant to the rules of the Michigan Supreme Court as then in effect for arbitration. All costs of arbitration shall be shared equally by the parties hereto except for legal fees. Each party shall pay its own legal representative. Any arbitration brought under this section shall be conducted in Detroit, Michigan.
 
 
 15
 (App. 43) (emphasis added). The master agreement also includes a choice of law provision making the agreement governed by California law. (App. 36, para. 15).
 
 The Arbitration
 
 16
 St. Luke's became dissatisfied with the system furnished by the defendant and filed a complaint for arbitration in July 1987. St. Luke's sought direct damages, incidental and consequential damages, punitive damages, and attorney fees. In total, St. Luke's sought to recover over $6 million. Plaintiff counterclaimed seeking unpaid license fees and agreed to arbitration of St. Luke's complaint.
 
 
 17
 In January 1988, the parties selected Thomas W. Murphy, an independent, non-lawyer, hospital information systems management consultant, as the single arbitrator for their dispute. After an initial meeting between Mr. Murphy and the parties, a dispute as to the scope of the arbitrator's authority arose. SMS filed a "Motion to Determine Scope of the Arbitration" before the district court, asserting that under the express terms of the contract the arbitrator could not award damages in excess of the software license fees paid by St. Luke's to SMS. To support this position SMS referenced paragraphs 16 and 35 of Exhibit A.
 
 
 18
 The district court found that any limitation on the arbitrator's authority in paragraph 16 "stands or falls with the facially valid limitation of liability provision" contained in paragraph 35. The court went on to hold:
 
 
 19
 Either before or after arbitration, the Court and the parties may have to address the issue of the validity of the limitation of liability clause. In the Court's view, the appropriate course of action is to send the entire matter to arbitration. After the arbitrator has evaluated the claim and rendered an award, the claim may return to this Court for enforcement. See MCLA 600.5001(2) & .5025. If Plaintiff St. Luke's receives, and then seeks enforcement of, an award in excess of "the amount of license fees paid out" by plaintiff, see Agreement Number 84-252, p 16, defendant obviously can interpose a challenge to the arbitrator's authority to make such an award. As the Michigan Supreme Court suggested in Detroit Automobile Inter-Insurance Exchange v. Gavin, 416 Mich. 407 (1982), an arbitration award that exceeds a valid, contractual limitation is subject to adjustment as a "substantial ... error of law." Id. at 444-45. When, and if, such a challenge occurs, the Court will be faced with the question of the limitation of liability provision's validity. Until that time, the Court will yield to the intention of the parties to arbitrate their disputes. Accordingly, IT IS ORDERED THAT the parties shall proceed to arbitration, the Arbitrator having full power to determine the merits of the controversy between the parties including, but not limited to, the validity of the damage limitation clause and the amount of damages, if any.
 
 
 20
 (App. 322-23). The parties then proceeded to arbitrate their dispute. Much of what occurred in the subsequent months and years is set out in St. Luke's motion to disqualify the arbitrator that was eventually filed. (App. 450-58).
 
 
 21
 The arbitrator held a series of hearings between June and November 1989. In the end, there were thirty days of hearings which generated over 6,000 pages of transcript. The arbitrator then requested the parties to prepare briefs and indicated that oral argument would follow. After each party submitted an opening brief and a reply brief in February 1990, two days of oral argument were held in March 1990. At oral argument, the arbitrator indicated that it might take two months, but not more than six months, to issue a decision. (App. 452).
 
 
 22
 Two months later, SMS sent a letter to the arbitrator identifying the issues which "SMS feels minimally must be addressed in any written decision by the arbitrator." Included in the issues were:
 
 
 23
 5. If the net reduction in value exceeds $300,360, is the contractual limitation of liability limiting Plaintiff's damages to license fees paid to date ($300,360) a valid, bargained for and enforceable contractual limitation?
 
 
 24
 ....
 
 
 25
 8. If consequential damages were suffered, is the contractual exclusion of consequential damages a valid, bargained for and enforceable limitation on the Hospital's consequential damage claims, or was the default so total and fundamental that the exclusion must be disregarded?
 
 
 26
 (Deft's br. at 9). In a letter responding to SMS's identification of the issues and specifically to items 5 and 8, St. Luke's stated: "The issue is whether under § 2-719(2) and the case law interpreting it, 'circumstances cause an exclusive or limited remedy to fail of its essential purpose.' Put another way ... did the limitation 'become oppressive by change of circumstances' during performance?" (Deft's br. at 9-10)
 
 
 27
 On May 22, 1990, the arbitrator stated that due to "certain deaths in his family he was running behind" schedule but that he did not expect to be delayed more than a week. (App. 452). In early June 1990, the arbitrator stated that he was still behind but expected to mail his decision that month. After waiting two months, St. Luke's counsel wrote to the arbitrator on August 10, 1990, stating that both he and SMS's counsel had been trying to reach him to set up a conference call to determine when the parties could expect a decision. On September 5, 1990, a conference call was held, during which the arbitrator stated he had just returned from a trip out of town. He told the parties he had encountered extensive interruptions in July and August but would now work solely on getting his decision out by late September.
 
 
 28
 No decision was rendered in September. On October 4, 1990, St. Luke's counsel wrote the arbitrator, stating that St. Luke's Board of Directors "has asked me to respectfully convey their concern over the delay in rendering your decision." The letter also advised the arbitrator that the parties would be calling to determine when a decision would be rendered. No response was received and, after telephone calls and an additional letter by counsel for St. Luke's, the parties eventually held a conference call with the arbitrator on November 1, 1990. When asked to explain the delay in rendering his decision, the arbitrator stated that, while he had spent some time on the matter, he had been delayed by non-related events. After the death of his mother, the arbitrator experienced a slow-down in his business. As a result, he was forced to turn his attention away from the arbitration to attracting new business for his firm, MCS. The arbitrator then stated that he hoped to have his decision ready in four to six weeks but did not feel comfortable in setting a specific date. He then set December 17, 1990, as an informal deadline.
 
 
 29
 In December, the arbitrator requested of both parties separately, in writing and by telephone, that his most recent bill be paid before the end of the year. He also told SMS's counsel that a decision was being typed and he expected it to be completed the last week of December. In keeping with the pattern established, December passed with no decision from the arbitrator. According to the bills received by the parties, the arbitrator had worked a total of 368 hours between March and October 1990. His bill for this time was $73,920. The arbitrator later billed the parties $15,000 for 75 hours of work performed in November and December 1990, and still no decision was rendered.
 
 
 30
 After several unanswered calls, messages, and letters, the arbitrator wrote to the parties on February 28, 1991:
 
 Gentlemen:
 
 31
 I realize that I have been out of contact with you for some time. I have been out of town most of January and February. MCS has been short of consulting assignments and has continued to require my time to keep things afloat. As I had previously indicated, there is a rough draft relating to the case that was completed late in December. I have had not time to review and revise it since then.
 
 
 32
 I will be back in town Wednesday March 6. At that time, I will be able to return to the arbitration case and commit over half time to the completion of my opinion.
 
 
 33
 (App. 456-57).
 
 
 34
 The months of March and April passed with no word from the arbitrator. It had now been over one year since the oral arguments and final briefs had been presented to the arbitrator, and he had promised to render a decision within two, but no more than six, months. On May 16, 1991, St. Luke's filed a "MOTION TO DISQUALIFY ARBITRATOR AND TO COMPEL RETURN OF ALL FEES PAID." In addition to relating the chronology of events leading to its motion, St. Luke's stated:
 
 
 35
 31. The purpose of arbitration is to obtain an expeditious and less costly decision than that afforded by the judicial system. In derogation of his responsibilities, the Arbitrator has failed to meet any reasonable time table, repeatedly failed to meet his own time table, and has continued to bill the parties for excessive amounts purportedly in the process of preparing such a decision. All the facts and circumstances show that the Arbitrator's motive is not to decide the case and render a just and fair decision, but to primarily use the case as a means to enhance his own livelihood during a difficult economic period for him. In the meantime, the evidence has grown stale, the parties have been billed an excessive amount of fees, and the purpose of arbitration lost.
 
 
 36
 (App. 457-58).
 
 
 37
 The attention and concern of the arbitrator was now fixed on the arbitration between the parties. A conference call was held on May 22, 1991. The arbitrator stated that he had reviewed St. Luke's motion and that he had "cleared [his] calendar for the next two weeks, not knowing what you'd want to do from here." (App. 575). The arbitrator then suggested to the parties, and in particular to counsel for St. Luke's, Alan Borlack, that the motion to disqualify be withdrawn and then he would issue his decision in the case. Specifically he stated:
 
 
 38
 What I would suggest to you, Alan, is that with my calendar cleared for the next two weeks, and given the state of where my decision was in December and the work I had done on it earlier this year, that I could send to you, both, a final copy of my decision on June 10th. If that is acceptable, I would suggest we go ahead.
 
 
 39
 (App. 575). After counsel for St. Luke's inquired whether the arbitrator thought he could make a fair decision, given the criticism contained in the motion to disqualify him, he responded:
 
 
 40
 I would say, number one, my decision, in essence, has already been made, and I do not intend to change it on the basis of that letter. What is left of it then, as I relayed to you earlier, I think, in the year was I had created a rough draft of it and had never put it into form for distribution and have not as yet, and that's the two weeks.
 
 
 41
 (App. 580). In response to a question from SMS's counsel concerning whether he would overcompensate in light of St. Luke's motion, the arbitrator stated: "I will just say, categorically, that this letter and these circumstances will not affect my decision. It has, for all intents and purposes, been made, and it's a matter of documenting it." (App. 582). On May 29, 1991, St. Luke's withdrew its motion to disqualify the arbitrator without prejudice to renew. On June 18, 1991, the arbitrator issued his decision. Enclosed with the decision was the arbitrator's final bill for $20,600. When all was said and done, the parties were billed a total of $261,041 for the arbitrator's services.
 
 
 42
 Accompanying the arbitrator's decision was a letter to the parties. This letter, in its entirety, reads:
 
 
 43
 Enclosed is the Notice of Award in the matter of the arbitration between St. Luke's Hospital (St. Luke's) and SMS Computer Systems, INC. (SMS).
 
 
 44
 As we are all aware, this has been a lengthy process: St. Luke's begins selection of a computer system in mid 1983; St. Luke's and Computer Synergy sign a contract in April 1984; St. Luke's files suit against SMS in July 1987; the parties select an arbitrator in January 1988; hearings begin in June 1989; and oral arguments close in March 1990.
 
 
 45
 The testimony and exhibits described a complex situation where both parties share responsibility for the problems encountered, the deterioration of the implementation relationship, and finally the breach of the agreement. Understanding what happened required careful review of the transcripts, exhibits, briefs, and authorities. Assigning and quantifying responsibility and awards was more difficult. However, it was in trying to document my decision that I had the most difficulty.
 
 
 46
 After a number of revisions to a document attempting to explain the factors entering into my decision, I found it growing to a size which was exceeding your final briefs. Therefore, I have decided to issue instead a Notice of Award. Hopefully this will provide less detail to analyze and take issue with, and more quickly bring these proceedings to a close.
 
 
 47
 I have also enclosed a final bill for arbitration services.
 
 
 48
 (App. 445-46). Attached was a two page "Notice of Award" which reads in full:
 
 
 49
 In April of 1984, St. Luke's Hospital (St. Luke's) and Computer Synergy Incorporated (CSI) entered into an agreement for the installation of a computer system. In May 1985 SMS Computer Systems, Inc. (SMS) acquired CSI. The plaintiff, St. Luke's Hospital, seeks" ... damages of a least $1,695,126 plus punitive damages, plus prejudgment interest at 7% per annum, arbitrator fees, and attorneys fees." ( [First Arbitration] Brief of Plaintiff, St. Luke's Hospital, Conclusion, p. 236). The defendant, SMS, "... asserts a counterclaim against the Hospital for money due for 'all of the services rendered by SMS or the license and other fees owed to SMS....' " (Shared Medical System's First Arbitration Brief, p. 65)
 
 Direct Damages
 
 50
 Based upon an analysis of the testimony, exhibits, and arguments presented, the Arbitrator awards direct damages of $850,000 to St. Luke's.
 
 Punitive Damages
 
 51
 In the matter of punitive damages, the Arbitrator finds that St. Luke's failed to prove by clear and convincing evidence that SMS was guilty of oppression, fraud, or malice as specified under Section 3294 of the California Code.
 
 
 52
 The Arbitrator declares that no punitive damages are awarded to St. Luke's.
 
 Prejudgment Interest
 
 53
 In the matter of the plaintiff[']s claim for prejudgment interest, the Arbitrator sites [sic] a statement made by Mr. Allan [sic] R. Borlack, attorney for the plaintiff during his closing argument (Tr. 6425), ".... I'm willing to accept his [Mr. Ortiz] argument assuming that we don't ever find a case different, that there, therefore, is no prejudgment interest in Michigan." The Arbitrator finds that the statement of acceptance supersedes the claim for prejudgment interest presented in the Brief of Plaintiff, St. Luke's Hospital.
 
 
 54
 The Arbitrator declares that no prejudgment interest be paid to St. Luke's.
 
 Arbitrator Fees
 
 55
 In the matter of the plaintiff[']s claim for arbitration fees, the Arbitrator finds that in Section 16 of Exhibit A of the agreement between St. Luke's and SMS the parties agreed that ".... All costs of arbitration shall be shared equally by the parties hereto except for legal fees. Each party shall pay for its own legal representative...."
 
 
 56
 The Arbitrator finds no reason to change the agreed upon terms regarding the sharing of the costs of arbitration. Therefore, no arbitration fees are awarded to St. Luke's.
 
 Attorneys Fees
 
 57
 In the matter of the plaintiff[']s claim for attorneys fees, the Arbitrator finds th[at] Section 16 of Exhibit A of the SMS agreement negotiated between St. Luke's and SMS (see above) supersedes Section 14 of the [ ] boilerplate contract.
 
 
 58
 The Arbitrator declares that each party shall pay their own attorneys fees.
 
 SMS Counterclaim
 
 59
 The defendant claims that ".... The amount owed by the Hospital to SMS under the contract is $157,056.77." (Shared Medical Systems; First Arbitration Brief, page 65). The award for damages of $850,000 made to St. Luke's is net of any amounts claimed due by SMS.
 
 
 60
 The Arbitrator declares that no payments are due SMS by St. Luke's.
 
 Conclusion
 
 61
 The Arbitrator declares that the award(s) granted above represent a complete and just award according to my best understanding of the evidence and arguments presented.
 
 
 62
 (App. 448-49).
 
 The Post-Arbitration Proceedings
 
 63
 St. Luke's sought to confirm the arbitrator's award in the district court. SMS responded by filing an "APPLICATION TO VACATE, MODIFY OR CORRECT" the award. SMS argued that the arbitrator had ignored the limitation provision on actual damages by awarding more than the license fees paid. SMS requested that the district court rule on the issue of the validity of the limitation clause de novo because the matter was not within the scope of the arbitrator's authority. Additionally, SMS argued that even if the viability of the damage limitation clause was properly before the arbitrator he exceeded his authority, and therefore the award in excess of the license fees paid should be vacated. SMS noted that the letter accompanying the award indicated that the arbitrator found that the parties "share responsibility" for the ultimate breakdown of the relationship and breach of the agreement, thus, under the facts as found by the arbitrator, voiding the bargained for actual damage limitation was a manifest disregard of the law. SMS asserted that when an arbitrator ignores a damage limitation clause in a contract, without explanation or even an indication that he was intentionally exceeding such limit, the arbitrator exceeds his authority. SMS also argued that while the arbitrator's decision did not address the award of consequential damages, the award of $850,000 was suspiciously 50 percent of the actual and consequential damages sought by St. Luke's and which was expressly listed in the first paragraph of the award. Thus, SMS argued, the arbitrator also awarded consequential damages without addressing the validity of the prohibition in the agreement against such awards.
 
 
 64
 The district court correctly found that the issue of the validity of the damage limitation clauses (limiting actual damages and barring consequential damages) was properly before the arbitrator and was presented to the arbitrator, thus a de novo review of their validity was inappropriate. The district court went on to conclude that, because the arbitrator awarded damages in excess of the license fees paid, it was "an inescapable conclusion that the arbitrator found a failure of essential purpose in the limited remedies." St. Luke's Hosp. v. SMS Computer Sys., Inc., 785 F.Supp. 1243, 1249 (E.D.Mich1991). The district court determined that the award should be confirmed because failure of essential purpose is a factual issue and under Michigan law a finding of fact by an arbitrator is unreviewable. Id. SMS then timely appealed the decision of the district court.
 
 II.
 
 65
 Under Michigan law, a court may vacate an arbitration award where the arbitrator exceeded his or her powers." Mich.Ct.R. 3.602(J)(1)(c). The burden of proving that an arbitrator has exceeded his powers is a heavy one. Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc., 894 F.2d 862, 866 (6th Cir.1990). "Arbitrators do not exceed their authority unless they display a manifest disregard of the law." Id. "[M]ore than a mere error in interpretation or application of the law" must be shown. Id. (quoting Anaconda Co. v. District Lodge No. 27 of the Int'l Ass'n of Machinists and Aerospace Workers, 693 F.2d 35, 37-38 (6th Cir.1982). The standard of review that we employ in these cases is very narrow. Id.
 
 
 66
 As the district court noted, Detroit Automobile Inter-Insurance Exchange v. Gavin, 416 Mich. 407 (1982), is the leading Michigan case in the area of review of arbitration awards. In Gavin, the Michigan Supreme Court modified two awards in automobile insurance arbitrations that were in excess of the policy limits. The arbitrators had exceeded the limits by stacking insurance policies, despite anti-stacking provisions in the contracts.
 
 
 67
 When parties enter into an agreement and spell out in a written contract the terms of their agreement, and they are so concerned with the enforcement of those terms that further provision is made within the same contract for resolution of potential disputes by arbitration, it is clear that the primary concern of the parties is the enforcement of the terms of the agreement which they have made, securing to each of them the benefits to which they are entitled under the applicable law, including their own agreement. Their secondary concern is the manner, expense, promptness, and finality with which an unintended and unexpected dispute between them will be resolved, should one develop.... The insurance company and the defendants contracted for the purpose of guaranteeing to themselves the benefits to which they are entitled under the law governing their contractual relationship: the constitution, the common law, any relevant codes and statutes, and, perhaps preeminent among all the provisions of their own contracts. We are not ready to assume that the parties in these cases agreed to forego observance of a plainly applicable provision of their written contract, one which is dispositive of the only matter genuinely in dispute between them, in exchange for a speedy, thrifty, and final resolution of their differences in a way which disregards the law substantially determinative of their rights and duties. The process of dispute resolution and the procedural advantages of arbitration are the servants of the law governing the issues in dispute, not the reverse.
 
 
 68
 Id. at 426-27. In Gavin, the court found that the question of the validity of the anti-stacking provisions was one of law. The court determined that in light of the anti-stacking provisions in the insurance contracts and a decision by the Michigan Supreme Court, albeit issued after the arbitrators had made their awards, finding anti-stacking provisions enforceable, the arbitrators had substantially erred as a matter of law and that such error had a substantial effect on the awards. The court vacated those portions of the awards that exceeded the policy limits, finding "just as a judge exceeds his power when he decides a case contrary to controlling principle of law, so does an arbitrator." Id. at 444.
 
 
 69
 The difference between Gavin and the case before us concerns the nature of the inquiry regarding the validity of the damage limitation clauses contained in the agreement between St. Luke's and SMS. Under California law, which pursuant to the terms of the contract governs all aspects of the agreement save the arbitration, the validity of a limitation on damages is a factual, case specific, inquiry. As summarized by the district court:
 
 
 70
 A substantial monetary limitation can only be disregarded if circumstances caused it to "fail of its essential purpose." See U.C.C. § 2-719(2). Under California law, "circumstances" have caused a damage limitation clause to fail of its essential purpose whenever the facts show that: 1) the damage limitation clause has become oppressive by change of circumstances, or 2) that the vendor's failure deprived a party of the substantial value of the bargain, U.C.C. commentary to § 2-719, or 3) that the breach is sufficiently fundamental that the parties did not contemplate such failure when they agreed to the damage limitation clause. The third might also be rephrased to when there has been a "total and fundamental default of the seller." In addition, each case is to be "examined on its o[w]n facts."
 
 
 71
 St. Luke's Hosp., 785 F.Supp. at 1248 (citations omitted). While we agree with the district court that the question of the validity of the limitation provisions is a question of fact, we disagree that from the award as written it is an "inescapable conclusion that the arbitrator" made the necessary factual determination. Were we to confirm the award on the basis of what the arbitrator wrote, we would be condoning the confirmation of any award in excess of a damage limitation clause. Under such a rule, it would be easy for an arbitrator to intentionally or unintentionally disregard the law which provides that damage limitation clauses are enforceable unless shown to be unconscionable or shown to fail of their essential purpose.
 
 
 72
 St. Luke's urges that because there was sufficient evidence in the record to show that the damage limitation clauses failed of their essential purposes we should assume the arbitrator so found. This, however, would require us to review the merits of the underlying dispute to determine if there was evidence from which an arbitrator could so rule. Under Michigan law, a court does not review the merits of a dispute that has been properly submitted to arbitration. Additionally, were we to modify the award by reducing the damages to equal the license fees paid, as SMS urges, we would be overstepping the bounds of our limited review of arbitrators' decisions. To modify the award in such a manner would require a finding that the damage limitation clause did not fail of its essential purpose. This also would require a review of the merits of the case, an inappropriate task for any court reviewing an arbitration award.
 
 
 73
 "The agreement of arbitration entered into between the parties sets the parameters of the arbitrator's authority." City Nat'l Bank of Detroit v. Westland Towers Apartments, 107 Mich.App. 213, 233 (1981), vacated on other grounds, 413 Mich. 937 (1982). In this case the arbitration agreement incorporated the damage limitation provision by providing that "Arbitration shall apply to amounts in controversy in excess of $10,000 and up to the amount of license fees paid out by [St. Luke's] as of that time...." (Exhibit A, para. 16) (emphasis added). We believe that when an arbitrator disregards a damage limitation provision, especially when the limitation has been specifically incorporated into the arbitration agreement, the arbitrator is under a duty to set out the reasons for such action or, at a minimum, expressly recognize that he is refusing to enforce the provision.
 
 
 74
 There is no doubt that an arbitrator, if he so decides, may indeed refuse to enforce such a damage limitation clause on the ground of unconscionability or on other grounds and today's decision does not in any way limit that power. What is required, however, is that the award indicate that he has in fact deliberately and intentionally exercised that power so that judicial review can proceed without the need for speculation as to what has in fact occurred in the arbitral tribunal.
 
 
 75
 In re Granite Worsted Mills, Inc., 25 N.Y.2d 451, 457 (1969). See also Farkar Co. v. R.A. Hanson Disc. Ltd., 604 F.2d 1, 2 (1979) ("the district court should direct the arbitrators to be bound by the limitation of damages provision unless in a separate determination expressed in the award they find the provision to be unconscionable...."). As the Michigan Supreme Court noted, "by ignoring express and unambiguous contract terms, arbitrators run an especially high risk of being found to have 'exceeded their powers.' " Gavin, 416 Mich. at 434. That risk is significantly increased when no explanation is given for voiding a damage limitation clause or no mention made that such a clause is being intentionally disregarded under the facts of the case. As Judge Martin indicated in Federated Department Stores, "the absence of any evidence of an arbitrator's decision process makes this Court's review of an arbitration award something of a judicial snipe hunt with counsel for the parties arguing about contract law analysis that may or may not have been manifestly disregarded by the arbitrator." Federated Dep't Stores, 894 F.2d at 871 (Martin, J., concurring). It is exactly that snipe hunt in which we refuse to engage.
 
 
 76
 Defendant argues that an arbitrator is under no duty to explain his decision. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598 (1960). But, as the Supreme Court noted, the absence of a supporting opinion is "undesirable[,] for a well-reasoned opinion tends to engender confidence in the integrity of the process and aides in clarifying the underlying agreement." Id. In the case before us, the only assistance the parties and the courts were given in understanding the award is contained in the letter accompanying the award. That letter indicates the arbitrator found the parties "share responsibility" for the breach of the agreement. While we are not prepared to say that the letter formally constitutes a part of the opinion of the arbitrator, it is an indication of how he viewed the facts and suggests that he may have disregarded the law in this area.
 
 
 77
 We therefore find it necessary to remand this matter to the arbitrator for clarification.[2] We emphasize that we are remanding this case for something repeatedly promised by the arbitrator, which should have occurred in the first instance, and for which the arbitrator already has been paid in full.
 
 
 78
 Upon remand, the arbitrator should first indicate whether the award includes an amount for consequential damages or if such damages are denied. The arbitrator also should indicate whether he is in fact deliberately and intentionally disregarding the damage limitation provision (or provisions, if consequential damages are awarded). Only in this way can judicial review proceed "without the need for speculation as to what has in fact occurred in the arbitral tribunal." In re Granite Worsted Mills, Inc., 25 N.Y.2d at 457.
 
 
 79
 It has long been clear that arbitrators are not free to dispense their "own brand of industrial justice." Enterprise Wheel & Car Corp., 363 U.S. at 597. As the Michigan Supreme Court noted in Gavin: "All would agree that [arbitrators] are not free to decide the disputes submitted to them by recourse to a coin toss, or other capricious means, entirely without regard to the controlling principles of law which govern the rights and duties of the parties." Gavin, 416 Mich. at 432. The sparse notice of award issued by the arbitrator in the case before us looks suspiciously like a Solomonic splitting of the baby. In the first paragraph the only dollar amount mentioned is St. Luke's claim for "damages of at least $1,695,126," while the second paragraph goes on to award $850,000--almost exactly half of the damages sought. This alone would not suffice to warrant a remand for clarification, but, coupled with the lack of any indication that the arbitrator was deliberately ignoring the damage limitation provisions, we are left with no other option but to remand.
 
 
 80
 "While this Court has a limited role in the review of arbitration awards, we are not a rubber stamp for unexplained and unsupported decisions rendered by arbitrators." Federated Dep't Stores, 894 F.2d at 871 (Martin, J., concurring). Even though the scope of our review is extremely narrow, under the circumstances presented in this case, we cannot perform our proper function without clarification from the arbitrator. Were we to confirm the award, we would be acting merely as a rubber stamp to the arbitrator's decision. We emphasize that our holding today is limited to the specific facts of this case.
 
 III.
 
 81
 St. Luke's has cross-appealed the district court's denial of its motion for attorney fees and costs associated with its motion to confirm the arbitrator's award. St. Luke's argues that it should be awarded attorney fees because paragraph 14 of the parties' agreement provides that "[i]n the event that either party is compelled to file suit to enforce any part of this Agreement, the losing party agrees to pay all court costs and reasonable attorney's fees incurred in such suit." (App. 36). We agree with the district court that these expenses are properly characterized as incident to arbitration and governed by paragraph 16 of Exhibit A annexed to the parties' agreement. The district court's denial of St. Luke's motion for attorney fees is affirmed.
 
 
 82
 AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further proceedings consistent with this opinion.
 
 
 
 [1]
 The terms of Exhibit A are expressly referenced in the master agreement at paragraph 2: "The term of this Agreement and the fee due Synergy hereunder are set forth in Exhibit "A" annexed hereto." (App. 35.)
 
 
 [2]
 The propriety of remanding disputes to an arbitrator is recognized in both the Michigan and federal courts. See, e.g., Cleveland Paper Handlers and Sheet Straighteners Union No. 11 of the Int'l Printing and Graphic Communications Union v. E.W. Scripps Co., 681 F.2d 457, 460 (6th Cir.1982) (ambiguous award should be remanded to the arbitrator); Federated Dep't Stores, 894 F.2d at 865 (district court remanded to arbitrators with instructions); North American Steel Corp. v. Siderius, Inc., 75 Mich.App. 391, 399 (1977) (remand to arbitrators by district court was proper, noting remand "commonly utilized by the Federal courts when faced with labor arbitration awards which need clarification"); E.E. Tripp Excavating Contractor, Inc. v. Jackson County, 60 Mich.App. 221, 257 (1975) (ordering recommittal to arbitrators for specific findings differentiating damages); see also In re Granite Worsted Mills, Inc., 25 N.Y.2d at 457 (matter remitted to the arbitrator). Remanding a dispute to the arbitrator is also authorized by Michigan Court Rule 3.602(J)(3) when an arbitrator has exceeded his power